UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CELESTER ARRINGTON

                                   Plaintiff,

          v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                   Defendant.
_____

**REPORT
and
RECOMMENDATION**

**09-CV-870 A(F)**

APPEARANCES:          LAW OFFICES OF KENNETH HILLER
                      Attorneys for Plaintiff
                      JOSEPH D. CLARK, of Counsel
                      6000 N. Bailey Avenue
                      Suite 1A
                      Amherst, New York 14226

                      WILLIAM J. HOCHUL, JR.
                      UNITED STATES ATTORNEY
                      Attorney for Defendant
                      JANE B. WOLFE
                      Assistant United States Attorney, of Counsel
                      Federal Centre
                      138 Delaware Avenue
                      Buffalo, New York 14202
                      STEPHEN P. CONTE
                      Chief Counsel - Region II
                      United States Social Security Administration
                      SUSAN REISS
                      Assistant Regional Counsel
                      Office of the General Counsel
                      26 Federal Plaza
                      Room 3904
                      New York, New York 10278

## JURISDICTION

This action was referred to the undersigned by Honorable Richard J. Arcara on

December 16, 2009. The matter is presently before the court on motions for judgment

on the pleadings, filed by Defendant on May 7, 2010 (Doc. No. 7), and by Plaintiff on July 12, 2010 (Doc. No. 9).

## BACKGROUND

Plaintiff Celester Arrington ("Plaintiff"), seeks review of Defendant's decision denying him Social Security Disability Insurance benefits ("SSDI"), and Supplemental Security Income ("SSI") (together "disability benefits") under, respectively, Titles II and XVI of the Social Security Act ("the Act"). In denying Plaintiff's application for disability benefits, Defendant determined that while Plaintiff had a severe impairment of bilateral knee pain with diagnostic evidence of osteoarthirits, Plaintiff's depressive disorder, anxiety disorder, and alcohol and canabis abuse in remission were not severe, and Plaintiff was therefore not disabled at any time through the date of the application until the date of the hearing on February 9, 2009. (R. 14).

## PROCEDURAL HISTORY

Plaintiff filed an application for disability benefits on October 25, 2006 (R. 95), that was initially denied by Defendant on April 13, 2007. (R. 47). Pursuant to Plaintiff's request, filed May 24, 2007 (R. 59), a hearing was held before an Administrative Law Judge ("the ALJ") on February 9, 2009, in Buffalo, New York. (R. 21-40). Plaintiff, represented by Joseph D. Clark, Esq., ("Clark") appeared and testified at the hearing. Testimony was also given by vocational expert Jay A. Steinbrenner ("Steinbrenner") ("the VE"). (R. 37-40). The ALJ's decision denying the claim was rendered on April 1, 2009. (R. 9). On June 4, 2009, Plaintiff requested review of the ALJ's decision by the Appeals Council. (R. 4-8). The ALJ's decision became Defendant's final decision when

the Appeals Council denied Plaintiff's request for review on September 18, 2009. (R. 1-3). This action followed on October 8, 2009, with Plaintiff alleging the ALJ erred by failing to consider him disabled as of October 22, 2006. (Doc. No. 1).

Following the filing of Defendant's answer on December 9, 2009, including the record of the administrative proceedings (Doc. No. 3), Defendant filed, on May 7, 2010, the instant motion for judgment on the pleadings("Defendant's motion") together with a memorandum of law (Doc. No. 8) ("Defendant's Memorandum"). Plaintiff filed a motion for judgment on the pleadings, or, alternatively, REMAND for further consideration ("Plaintiff's motion") on July 12, 2010, accompanied by a supporting memorandum of law (Doc. No. 9) ("Plaintiff's Memorandum"). Oral argument was deemed unnecessary.

Based on the following, Defendant's motion should be DENIED; Plaintiff's motion seeking judgment on the pleadings should be DENIED, Plaintiff's motion alternatively seeking remand should be GRANTED, and the matter REMANDED for further development of the record.


## **FACTS**[1]

Plaintiff, was born on November 13, 1955, completed a GED, served in the United States Navy from 1974 to 1978, when he was honorably discharged, was incarcerated from 1993 to 2000 for bank robbery, and worked as an electronic assembler (semi-skilled, light) from September 2000 until July 2003, a laundry helper from June 2004 until February 2005, and a press helper (semi-skilled, heavy) from

---

[1]Taken from the pleadings and the administrative record.

February 2005 until October 22, 2006, the alleged date of disability onset. (R. 130).

Plaintiff is separated from his wife and lives with friends or in a homeless shelter. (R.

178, 286, 301).

Because Plaintiff is a veteran, he obtains much of his medical treatment from the

Veteran's Administration ("V.A."), including at the Veteran's Hospital in Buffalo, New

York ("the V.A. Hospital"), where he is examined by different physicians rather than a

regular, primary care physician. On January 26, 2006, William T. Florio, M.D. ("Dr.

Florio"), a staff radiologist at the V.A. Hospital, reviewed an X-ray of Plaintiff's right knee

that showed "narrowing within all three knee compartments . . . [and] slight increased

soft tissue density within the supratellar region [area above the kneecap and behind the

quadriceps] ." (R. 187)(bracketed material added).[2] Dr. Florio opined Plaintiff's X-ray

revealed a three compartment change that "[could] not entirely exclude supratellar joint

effusion (swelling)," diagnosed Plaintiff with hemothrosis (bleeding into a joint space),

surgically aspirated Plaintiff's knee fluid, and prescribed a knee immobilizer and cane

after Plaintiff refused crutches. (R. 195).

On February 22, 2006, V.A. Hospital staff radiologist Angelo M. Delbalso (Dr.

Delbalso"), evaluated a magnetic resonance imaging ("MRI") of Plaintiff's right knee that

showed

> . . . findings suggestive of a tear/sprain in the distal portion of the fibular
> collateral ligament . . . a bucket handle type tear noted involving the lateral
> meniscus, with displacement of a significant portion of the meniscus towards [*sic*]
> the region of the femoral notch. . . . [a] horizontal type tear [*sic*] in the posterior
> horn of the medial meniscus . . . a complete disruption of the anterior cruciate
> ligament consistent with a tear . . . [and] increased signal noted in the region of

---

[2] Unless otherwise indicated, all bracketed material is added.

the medial tibial spine and adjacent metaphysis. The edema (swelling caused by excess fluid) appears to extend into the proximal portion of the central tibia as well as along the remnants of physis (segment of bone responsible for lengthening). An area consistent with a nondisplaced fracture below the level of the medial tibial spine is also appreciated. The patellofemoral articulation demonstrates degenerative changes involving primarily the lateral compartment of the knee. A significant joint effusion (build up of joint fluid) is identified.

(R. 186).

An X-ray of Plaintiff's knees on September 5, 2006, by Linda Fuchs, D.O. ("Dr. Fuchs"), attending physician at the V.A. Hospital, showed "tricompartment degenerative changes of both knees . . . [with] Pellegrini-Strieda disease (disease affecting the superior or femoral attachment of the medial collateral ligament of the knee) on the left." (R. 182). On September 20, 2006, Plaintiff sought treatment at Kenmore Mercy Hospital in Buffalo, New York for knee pain related to tripping at work. (R. 212). An X-ray by Paul F. Pizzella, M.D. ("Dr. Pizzella") of Plaintiff's right knee showed a "large joint effusion . . . [a]dvanced osteoarthiritc changes . . . [and] evidence of joint space loss." (R. 216). On September 22, 2006, a Work Status Report completed by Health-Works Western New York, showed Plaintiff limited to standing and walking only twenty-five percent of each work shift, and restricted to crutches. (R. 217).

On October 23, 2006, Plaintiff sought treatment from Erie County Medical Center in Buffalo, New York for knee pain and swelling. (R. 218). David A. Paul, M.D. ("Dr. Paul") evaluated an X-ray of Plaintiff's right knee that showed "prominent effusion . . . marked squaring of the patella (kneecap) with some loss of the retropatellar space (area where the knee bone and thigh bone meet), posterior marginal spurring, and tibial spine pointing with lateral tibial (inner leg bone) and medial spurring." (R. 221).

On January 5, 2007, Plaintiff sought mental health counseling from the V.A.

Hospital, in Buffalo, New York, where Licensed Practical Nurse Mary A. Gillingham ("Nurse Gillingham") noted Plaintiff felt upset about things in his life, that Plaintiff's son was in jail, and that Plaintiff "felt like hurting someone." (R. 437). On January 19, 2007, Plaintiff telephoned Registered Nurse Amy B. Burns ("R.N. Burns") at the V.A. Hospital with complaints of blood in his urine. (R. 437).

On January 29, 2007, Plaintiff received outpatient mental health counseling from Licensed Master Social Worker Brandi Page ("S.W. Page"), who evaluated Plaintiff with a Global Assessment of Functioning ("GAF") score of 45[3] (R. 434-35). Plaintiff reported he experienced homicidal ideations, described as verbally lashing out at people rather than any intention to harm, swearing, anger, decreased interest and pleasure, intrusive memories and nightmares related to violence he witnessed while incarcerated, and difficulty sleeping at night. (R. 435). Plaintiff's medications included Docusate (stool softener), Hydrochlorothiazide (diuretic), Hydrocodone (painkiller), and Meloxicam (anti-inflammatory). (R. 435).

On February 6, 2007, Psychiatrist Rose Marie Gustilo, M.D. ("Dr. Gustilo"), noted Plaintiff was "[f]eeling persistently depressed with anhedonia, inability to stay asleep, averaging one hour of sleep nightly, feeling tired the following day with low motivation and energy, poor concentration, nightmares about his experiences at prison, and poor anger management." (R. 431). Dr. Gustilo noted Plaintiff had been "depressed for

---

[3] The Global Assessment of Functioning (GAF) scale is used to report an individual's overall level of functioning. *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Edition, Text Revision) ("DSM-IV-TR"). "A GAF of 41-50 indicates: Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or social functioning (e.g., no friends, unable to keep a job). A GAF of 51-60 [indicates] moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or social functioning (e.g., few friends, conflicts with peers or co-workers." DSM-IV-TR at 32 (emphasis in original).

years, [and] felt his symptoms worsened 1 ½ years ago," and diagnosed Plaintiff with major depression, single episode, moderate dysthmic disorder (chronic depression), personality disorder not otherwise specified ("NOS") with antisocial features, polysubstance abuse in remission, severe osteoarthritis with recurrent knee swelling and chronic pain, rated Plaintiff's psychosocial stressors as "severe" related to health problems that interfere with Plaintiff's ability to work, resulting financial problems, and the recent imprisonment of Plaintiff's son. *Id*. Dr. Gustilo evaluated Plaintiff with a GAF score of 50, referred Plaintiff to anger management group therapy, and prescribed Celexa (antidepressant). (R. 432). On February 8, 2007, Mark T. Oriowski, RPA-C ("Physician Assistant Oriowski") examined Plaintiff, and opined Plaintiff should attend physical therapy and not return to work until re-evaluation of Plaintiff's MRI.[4] (R. 272).

On February 14, 2007, Licensed Practical Nurse Vivian A. Hokes ("LPN Hokes") provided tobacco counseling to Plaintiff, referred Plaintiff to a Stop Smoking Clinic, and noted Plaintiff had entered anger management treatment. (R. 431). On February 27, 2007, Kathleen Kelley, M.D. ("Dr. Kelley") performed a consultative internal medicine examination on Plaintiff, and diagnosed Plaintiff with uncontrolled hypertension, crepitus (grating) of both ankles on extension and flexion, crepitus in Plaintiff's bilateral knees on palpation with flexion, no knee redness, swelling, or effusion, bilateral knee arthritis that "needs intervention," depression, and nonspecific back discomfort. (R. 227). Dr. Kelley diagnosed Plaintiff with progressive degenerative arthritis of both knees and opined Plaintiff should minimize kneeling for any length of time. (R. 227).

---

[4] The record does not indicate the date of the MRI.

On February 27, 2007,  Renee Baskin, PhD., ("Dr. Baskin"), performed a psychiatric evaluation on Plaintiff on behalf of the Social Security Administration, and evaluated Plaintiff with a stiff and slow gait, mildly impaired attention and concentration secondary to physical pain or discomfort, and opined Plaintiff was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, learn new tasks, perform complex tasks with supervision, make appropriate decisions and relate adequately with others, and that Plaintiff's medical/physical problems may interfere with his ability to maintain a regular schedule. (R. 233). Dr. Baskin diagnosed Plaintiff with depressive order NOS, anxiety disorder NOS, pain disorder associated with general medical condition, polysubstance dependence abuse in full remission, arthritis, and high blood pressure. *Id*.

On March 5, 2007, Jitendra M. Sanghvi, M.D. ("Dr. Sanghvi"), evaluated an X-ray of Plaintiff's right knee taken March 5, 2007, that showed "mild osteoarthitis involving the medial (closest to the left knee) side of the joint . . . mild patellofemoral arthritis . . . a small joint effusion . . . [and a] large osteophyte projecting from the medial condyle (rounded prominence at the end of a bone) of [Plaintiff's] femur." (R. 228). On March 14, 2007, Clinical Nurse Specialist Fern E. Beavers (Nurse Beavers") noted Plaintiff failed to attend a mental health counseling appointment at V.A. Hospital. (R. 427).

Plaintiff attended 27 physical therapy treatment sessions from December 28, 2006 until April 19, 2007 (R. 273-75), and, upon discharge, Physical Therapist Stacey J. Lenhard ("P.T. Lenhard") opined Plaintiff had reached his maximal functional potential, may have plateaued, and had shown minimal progress for one month. (R. 273). P.T. Lenhard evaluated Plaintiff with the ability to perform a single limb stand on the right leg

8

for ten seconds, the ability to perform a single leg stand on the left leg for more than 30 seconds, opined Plaintiff was unable to perform a single limb stand with flexion on the right, but able to perform a single limb stand with flexion on the left for more than 30 seconds. *Id*.

On April 9, 2007, M. Totin, a state agency psychologist, ("Psychologist Totin"), completed a psychiatric review of Plaintiff, and opined Plaintiff demonstrated a mild degree of limitation with respect to maintaining social functioning, and concentration, persistence or pace, that Plaintiff was unlimited as to activities of daily living, and experienced no repeated episodes of decompensation. (R. 245).

On April 12, 2007, Disability Examiner I. Larios[5] ("D.E. Larios") conducted a physical residual functional capacity assessment of Plaintiff, and opined Plaintiff demonstrated the ability to occasionally lift or carry up to 20 pounds, stand and/or walk about six hours in an eight hour day, sit for a total of six hours in an eight hour workday, and exhibited an unlimited capacity to push or pull. D.E. Larios opined Plaintiff's knee X-ray[6] showed "mild osteoarthritis." (R. 250).

On April 17, 2007, Plaintiff was examined at the V.A. Hospital Mental Health Clinic for depression. (R. 425). Mahmud Mirza, M.D. ("Dr. Mirza") diagnosed Plaintiff with polysubstance abuse, possibly in remission, personality disorder, NOS, depression, NOS, opined Plaintiff was oriented to time, place, and person, was relevant, coherent and cooperative, noted Plaintiff denied suicidal or homicidal ideation,

---

[5]Whether I. Larios is a medical doctor or other health professional is not indicated in the record.

[6] The record does not indicate the date of the X-ray.

and prescribed Seroquel (anti-psychotic medication). *Id*. On April 26, 2007, Plaintiff

sought treatment from V.A. Hospital emergency room claiming he "had nowhere to go,"

that his main problem was "anger and not being able to sleep" (R. 417), and that the

Celexa medication Plaintiff was taking "put him in very high gear and he could not

control himself." (R. 425). Arrangements were made for an appointment in the

Substance Abuse Treatment ("SAT") Clinic, where Plaintiff was seen later that day by

R.N. Richard Cudzilo ("R.N. Cudzilo"). (R. 418).

On April 26, 2007, Plaintiff presented to the V.A. Hospital emergency room

stating he "wanted to be hospitalized because he d[id]n't know what to do and . . . [wa]s

not feeling well," and had used crack[7] on April 23, 2007. (R. 420). Marilyn Ordonez,

M.D. ("Dr. Ordonez") diagnosed Plaintiff with polysubstance induced mood disorder,

polysubstance dependence (cocaine/ETOH/opiates), personality disorder with

antisocial and dependent features, evaluated Plaintiff with a GAF score of 48, and

opined Plaintiff did not meet the criteria for psychiatric hospitalization because Plaintiff

was not disabled and did not pose a danger to himself or others. *Id*. Plaintiff returned to

the V.A. Hospital emergency room for treatment on April 27, 2007 (R. 418), where Dr.

Mirza arranged for an appointment for Plaintiff at the SAT clinic. (R. 418). On April 30,

2007, Plaintiff was admitted to the V.A. Hospital for inpatient psychiatric counseling. (R.

283). Upon admission, Dr. Mirza reported Plaintiff wanted to "take out" other people,

was feeling more angry, and reported he had relapsed and used crack on the morning

of his admission. *Id*. Plaintiff reported feeling depressed, decreased sleep with

---

[7]"Crack" is crack cocaine, a highly addictive and powerful stimulant derived from powdered cocaine using a simple conversion process. Http://www.justice.gov.ndic/pubs3/3978/index.htm#What

nightmares, decreased appetite, homicidal and suicidal thoughts, and was evaluated

with a GAF score of 30. *Id.*

On May 1, 2007, V.A. Hospital Psychiatric Resident Maria Lourdes Oliveira

("Resident Oliveira") diagnosed Plaintiff with mood disorder NOS, ruled out ("r/o")

substance disorder, cocaine dependence, history of opiate dependence, r/o PTSD (post

traumatic stress disorder), hypertension, osteoarthritis, hepatitis C, and evaluated

Plaintiff with a GAF score of 30. (R. 380). Upon examination on May 2, 2007, Resident

Oliveira noted Plaintiff

> [R]eport[ed] that he remains 'sad' because 'I'm thinking about a lot of things.'
> [But] would not elaborate further as to what he was referring to [*sic*]. [Resident
> Oliveira] illicited questions about [Plaintiff's] past traumas while in jail and he
> stated he witnessed some of his fellow prisoners being stabbed. He admits to
> having nightmares in which he envisions himself back at prison and others are
> stabbing him. He denies actually reliving the experience in his dreams or while
> awake. He admits to some social isolating behavior but denies symptoms of
> hyperarousal. (R. 357-58).

Resident Oliveira opined that Plaintiff's affect was "sorrowful and congruent," Plaintiff's

thought process was goal directed, Plaintiff's answers to questions were "vague," and

Plaintiff's insight and judgment remained poor. *Id.* Plaintiff's  discharge medications

included Amoxicillin (pain), Hydrochlorthiazide (fluid retention), Meloxicam (swelling and

pain), and Quetiapine (anti-psychotic). (R. 336). Social Worker Jennifer Walton, LCSW,

CASAC ("S.W. Walton") noted Plaintiff rated his knee pain as nine out of 10 on a 10

point scale, that Plaintiff requested therapy for a recent lapse to cocaine and street

Suboxone, and that Plaintiff reported he was taking too much pain medication, and that

it did not help. (R. 354). A sonogram of Plaintiff's abdomen on May 2, 2007, showed

mild dilatation of Plaintiff's common hepatic duct (duct at the junction of the left and

right sides of the liver). (R. 282).

On May 3, 2007, Social Worker Tricia A. Masecchia ("S.W. Masecchia") noted Plaintiff requested "detox" referral to Substance Abuse Residential Rehabilitation Treatment Program ("SARRTP"), and expressed an interest in vocational rehabilitation in the near future. (R. 369-70). S.W. Masecchia diagnosed Plaintiff with polysubstance dependence and depression. *Id*. Aimee Stanislawski-Zygaj, M.D. ("Dr. Stanislawski-Zygaj") opined Plaintiff was sorrowful, fatigued, and very superficial, that Plaintiff's thought process was goal directed without substance, and that Plaintiff's insight and judgment remained poor. (R. 346). Upon Plaintiff's discharge from V.A. Hospital, Dr. Stanislawski-Zygaj opined Plaintiff's mood was "mixed," that Plaintiff's thought process was goal directed with limited substance, and that Plaintiff's insight and judgment were "improving." (R. 286). After evaluating Plaintiff with a GAF score of 55, Dr. Stanislawski-Zygaj discharged Plaintiff to the City Mission (homeless shelter). (R. 286).

On May 10, 2007, Plaintiff returned to Dr. Mirza, who refilled Plaintiff's Seroquel prescription, and encouraged Plaintiff to enter addiction treatment. (R. 324-25). An MRI of Plaintiff's left knee by Dr. Delbalso on May 10, 2007, showed "complete disruption of the posterior horn of the lateral meniscus . . . significant degenerative changes . . . within the posterior horn of the medial meniscus . . . consistent with a complex tear involving the posterior horn of the medial meniscus . . . changes [ ] consistent with high grade sprain/significant partial tear involving the anterior cruciate ligament . . . degenerative changes in [Plaintiff's] distal femur and proximal tibia . . . [and] joint effusion." (R. 279).

On May 24, 2007, Amjad Mreyoud, M.D. ("Dr. Mreyoud"), completed a

12

gastroenterological consultation on Plaintiff for history of Hepatitus C ("HCV"), and noted Plaintiff's blood test laboratory results of April 30, 2007 revealed albumin[8] of 4.1 g/dL, total bilirubin[9] of 0.7 mg/dL, aspartate aminotransferase ("AST")[10] of 135 IU/L, alanine transaminse ("ALT")[11] of 62, and viral load[12] of 1,382,480, and cocaine was present in Plaintiff's urine. (R. 322). Dr. Mreyoud noted further treatment for Plaintiff's HCV was "ill advised" before Plaintiff's depression, chronic pain, and substance abuse were resolved, opined Plaintiff's newly elevated ALT levels were worrisome for worsening disease, and noted Plaintiff was not interested in a repeat liver biopsy. (R. 321).

On May 24, 2007, Jayne Crummet, M.A. CASAC ("Addiction Therapist Crummet") evaluated Plaintiff for treatment in the Veteran Hospital's SARRTP program. (R. 321). Addiction Therapist Crummet noted Plaintiff reported he was seeking treatment for his pain because Plaintiff's pain medication was not working, and that Plaintiff had been purchasing Suboxone (to treat Plaintiff's opiate addiction) "on the street," to help relieve his knee pain. (R. 321).

Plaintiff failed to keep an appointment with Dr. Mirza on August 31, 2007. (R.

---

[8]Albumin is a liver protein used to detect disease. Normal albumin range is 3.4 - 5.4 g/dL(grams per deciliter).

[9]Bilirubin is a pigment in the liver bile used to detect disease. Normal total bilirubin range is 0.3 - 1.9 mg/dL (milligrams per deciliter).

[10]AST is a liver enzyme used to detect disease. Normal AST range is 10 - 34 IU/L (international units per liter).

[11]ALT is a liver enzyme used to detect disease. Normal range of ALT varies depending on factors like age and race.

[12]Viral load measures viral particles per milliliter of blood. Levels of 200,000 - 1,000,000 are low; 1,000,000 - 5,000,000 are medium; 5,000,000 - 25,000,000 are high; above 25,000,000 are very high.

312). On September 21, 2007, Dr. Mirza noted Plaintiff was active in the V.A. Hospital Mental Health Clinic for substance abuse, was using cocaine, alcohol, and marijuana, but refused to enter rehabilitative treatment. (R. 311).

On October 9, 2007, Reuben Cartagena, M.D. ("Dr. Cartagena") diagnosed Plaintiff with hematuria (blood in urine), and performed a urinary cystoscopy on Plaintiff. (R. 311).

On January 18, 2008, Dr. Mirza noted Plaintiff continued using cocaine, drinking, and smoking marijuana. (R. 308). On February 1, 2008, Dr. Mirza reviewed Plaintiff's medications, and encouraged Plaintiff to enter substance abuse rehabilitation. (R. 308).

On February 11, 2008, Allison M. Fout, RPA-C ("P.A. Fout") completed an Orthopedic and Miscellaneous Report for the Office of Vocational and Educational Services for Individuals with Disabilities ("VESID"), and opined Plaintiff's disability was "permanent," that Plaintiff should avoid work conditions in high places, had difficulty with repetitive lower extremity motion, was able to work six to eight hours five days each week, could lift, carry, push or pull 10 to 20 pounds, should avoid stooping or bending, had some limitation to walking and standing, was interested in working, and had expressed an interest in VESID training. (R. 444).

On April 11, 2008, Vocational Rehabilitation Counselor Peter Nightengale ("Counselor Nightengale") completed a Health and Functional Assessment Checklist for the Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") for Plaintiff, evaluated Plaintiff with difficulty standing, walking, and climbing, opined that Plaintiff required "special parking," and that Plaintiff had few general or personal skills transferable to a new job situation. (R. 445-46).

14

On April 15, 2008, Vocational Rehabilitation Specialist William H. Kapanek ("Rehabilitation Specialist Kapanek") noted that Plaintiff was living with a friend, but "was technically homeless." (R. 301). On April 17, 2008, Plaintiff visited Physician Assistant Alice M. Barber ("P.A. Barber") to request pain medication. (R. 307). Dr. Florio reviewed an X-ray of Plaintiff's left knee taken April 17, 2008, that showed "degenerative changes within all three compartments . . . osteophytic supurring aris[ing] from the medial joint space . . . patellofemoral narrowing . . . [and] small posterior patellar osteophytes." (R. 277). On April 30, 2008, Rehabilitation Specialist Kapanek noted Plaintiff was self medicating to deal with his knee pain "and that this is causing him problems." (R. 298). Plaintiff stated he intended to seek help from a pain clinic with the hope such treatment would allow Plaintiff "to stop his self medicating processes." (R. 298). On May 19, 2008, Plaintiff visited Physical Therapist Dirienzo ("P.T. Dirienzo"), who noted Plaintiff exhibited moderate swelling on both knees, assessed Plaintiff with significant knee pain with degenerative changes, and rated Plaintiff's prognosis as "poor." (R. 297). On May 22, 2008, Dr. Mirza provided psychiatric counseling to Plaintiff and noted Plaintiff's Seroquel medication was helping Plaintiff to sleep. (R. 296). On May 30, 2008, Physical Therapy Assistant John Quagliana ("P.T.  Asst. Quagliana") provided Plaintiff physical therapy treatment, and noted Plaintiff's pain level was four to five out of 10 on a 10 point scale. (R. 295).

On August 12, 2008, Dr. Mirza provided psychiatric counseling to Plaintiff, noted Plaintiff reported he was attending an adult learning center to increase his reading skills to become involved in a school program, and that Plaintiff's sleep medication was helping him to sleep. (R. 295).

On September 17, 2008, Plaintiff entered VESID educational training including classes in computer repair and electronic troubleshooting, introduction to computers, and GED test preparation. (R. 450-56).

On January 2, 2009, Psychiatrist Dong Yup Shim, M.D. ("Dr. Shim") noted Plaintiff was grieving the loss of his father, but in good control, and re-filled Plaintiff's prescription for Seroquel. (R. 266-67). A consultative therapy assessment performed by P.T. Dirienzo on January 15, 2009, showed that Plaintiff reported being able to sit for one-hour at a time, stand for 30 minutes, ambulate at least 15 minutes, sit between five and six hours, and that Plaintiff did not require any assistive devices for ambulation. (R. 264). P.T. Dirienzo opined that during an 8-hour day, Plaintiff was able to sit between five to six hours with frequent breaks, stand for one-hour, walk for one-hour, ambulate for 15-minutes at a time, was able to lift 10 - 20 pounds and 21 to 30 pounds, occasionally lift 21-50 pounds, and occasionally climb stairs, climb, fully stoop, kneel, crouch, and crawl. (R. 264).

At Plaintiff's administrative hearing on April 9, 2009, Plaintiff testified he had not used drugs since May 2008 (R. 27), and that he was required to lay down for two hours in an eight-hour period because of his knee pain. (R. 35). The ALJ recognized Plaintiff's military service (R. 36), as well as Plaintiff's incarceration (R. 35), and limited the hypothticals posed to the VE to those involving light work. (R. 38). Plaintiff's attorney limited Plaintiff's disability claim to Plaintiff's knee disorder, and alleged Plaintiff's mental disorder was a result of Plaintiff's substance abuse, which was attributed to self-medicating for Plaintiff's knee pain, and emphasized Plaintiff was not claiming disability based on a mental impairment. (R. 36).

16

**DISCUSSION**

1.      **Disability Determination Under the Social Security Act**

An individual is entitled to disability insurance benefits under the Social Security

Act if the individual is unable

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or
> can be expected to last for a continuous period of not less
> than 12 months. . . .  An individual shall be determined to be
> under a disability only if his physical or mental impairment or
> impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy.

42 U.S.C. §§ 423(d)(1)(A) & (2)(A), and 1382c(a)(3)(A) & (C)(I).

Once a claimant proves he or she is severely impaired and unable to perform any past

relevant work, the burden shifts to the Commissioner to prove there is alternative

employment in the national economy suitable to the claimant. *Parker v. Harris,* 626 F.2d

225, 231 (2d Cir. 1980).

A.      <u>**Standard and Scope of Judicial Review**</u>

The standard of review for courts reviewing administrative findings regarding

disability benefits, 42 U.S.C. §§ 401-34 and 1381-85, is whether the administrative law

judge's findings are supported by substantial evidence. *Richardson v. Perales*, 402 U.S.

389, 401 (1971). Substantial evidence requires enough evidence that a reasonable

person would "accept as adequate to support a conclusion." *Pollard v. Halter,* 377 F.3d

183, 188 (2d Cir. 2004) citing *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co.*

*v. NLRB*, 305 U.S. 197, 229 (1938)).

While evaluating a claim, the Commissioner must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and . . . educational background, age and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983) (quoting *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981)). If the opinion of the treating physician is supported by medically acceptable techniques and results from frequent examinations, and the opinion supports the administrative record, the treating physician's opinion will be given controlling weight. 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d)*; Scherler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

The Commissioner's final determination will be affirmed, absent legal error, if it is supported by substantial evidence. *Dumas*, 712 F. 2d at 1550; 42 U.S.C. §§ 405(g) and 1383(c)(3). "Congress has instructed . . . that the factual findings of the Secretary,[13] if supported by substantial evidence, shall be conclusive." *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

The applicable regulations set forth a five-step analysis the Commissioner must follow in determining eligibility for disability insurance benefits.  20 C.F.R. §§ 404.1520 and 416.920.  *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). The first step is to determine whether the applicant is engaged in substantial gainful activity during the period of which benefits

---

[13] Pursuant to the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995.

are claimed.  20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in

such activity the inquiry ceases and the claimant is not eligible for disability benefits. *Id.*

The next step is to determine whether the applicant has a severe impairment which

significantly limits the physical or mental ability to do basic work activities as defined in

the applicable regulations.  20 C.F.R. §§ 404.1520(c) and 416.920(c). Absent an

impairment, the applicant is not eligible for disability benefits. *Id.* Third, if there is an

impairment and the impairment, or an equivalent, is listed in Appendix 1 of the

regulations and meets the duration requirement, the individual is deemed disabled,

regardless of the applicant's age, education or work experience, 20 C.F.R. §§

404.1520(d) and 416.920(d), as, in such a case, there is a presumption the applicant

with such an impairment is unable to perform substantial gainful activity.[14]  42 U.S.C. §§

423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. §§ 404.1520 and 416.920.  *See also*

*Cosme v. Bowen*, 1986 WL 12118, * 2 (S.D.N.Y. 1986); *Clemente v. Bowen*, 646

F.Supp. 1265, 1270 (S.D.N.Y. 1986).

However, as a fourth step, if the impairment or its equivalent is not listed in

Appendix 1, the Commissioner must then consider the applicant's "residual functional

capacity" and the demands of any past work.  20 C.F.R. §§ 404.1520(e), 416.920(e). If

the applicant can still perform work he or she has done in the past, the applicant will be

denied disability benefits. *Id.* Finally, if the applicant is unable to perform any past work,

the Commissioner will consider the individual's "residual functional capacity," age,

education and past work experience in order to determine whether the applicant can

---

[14] The applicant must also meet the duration requirement which mandates that the impairment must last or be expected to last for at least a 12-month period.  20 C.F.R. §§  404.1509 and 416.909.

perform any alternative employment. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See also*

*Berry v. Schweiker, supra*, at 467 (where impairment(s) are not among those listed,

claimant must show that he is without "the residual functional capacity to perform [his]

past work"). If the Commissioner finds that the applicant cannot perform any other work,

the applicant is considered disabled and eligible for disability benefits. *Id.* The applicant

bears the burden of proof as to the first four steps, while the Commissioner bears the

burden of proof on the final step relating to other employment. *Berry, supra*, at 467. In

reviewing the administrative finding, the court must follow the five-step analysis to

determine if there was substantial evidence on which the Commissioner based the

decision. *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

**B.    Substantial Gainful Activity**

The first inquiry is whether the applicant engaged in substantial gainful activity.

"Substantial gainful activity" is defined as "work that involves doing significant and

productive physical or mental duties" done for pay or profit. 20 C.F.R. § 404.1510(a)(b).

Substantial work activity includes work activity that is done on a part-time basis even if it

includes less responsibility or pay than work previously performed. 20 C.F.R. §

404.1572(a). Earnings may also determine engagement in substantial gainful activity.

20 C.F.R. § 404.1574.  In this case, the ALJ concluded Plaintiff did not engage in

substantial activity since October 22, 2006, the alleged onset date. (R. 14). Plaintiff

does not contest this finding.

**C.    Severe Physical or Mental Impairment**

The second step of the analysis requires a determination whether Plaintiff has a

severe medically determinable physical or mental impairment that meets the duration

requirement in 20 C.F.R. § 404.1509 ("§ 404.1509), and significantly limits the Plaintiff's

ability to do "basic work activities."  The Act defines "basic work activities" as "abilities

and aptitudes necessary to do most jobs," and includes physical functions like walking,

standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for

seeing, hearing, and speaking; understanding, carrying out, and remembering simple

instructions; use of judgment; responding appropriately to supervision, co-workers and

usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§

404.1521(b), 416.921(b).

Here, the ALJ found Plaintiff's impairment of bilateral knee pain with objective

diagnostic evidence of osteoarthritis was severe, and that Plaintiff's medically

determinable impairments of depressive disorder, anxiety disorder, alcohol and

cannabis abuse in remission, and Hepatitis C were not severe. (R. 14). Plaintiff does

not contest this finding.

> **D.**    **Listing of Impairments, Appendix 1**

The third step is to determine whether a claimant's impairment or impairments

are listed in the regulations at Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P ("The Listing of

Impairments"). If the impairments are listed in the Appendix, and the duration

requirement is satisfied, the impairment or impairments are considered severe enough

to prevent the claimant from performing any gainful activity and the claimant is

considered disabled. 20 C.F.R. §§ 404.1525(a), 416.925(a); *Melville v. Apfel*, 198 F.3d.

45, 51 (2d Cir. 1999) ("if the claimant's impairment is equivalent to one of the listed

impairments, the claimant is considered disabled").

In this case, the ALJ, as required, evaluated Plaintiff's impairments under 20

C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, directed to consideration of the Listing

of Impairments, and determined "the clinical signs, symptoms and functional limitations

related to the claimant's impairments do not remotely approach in severity the required

critieria of any musculoskeletal, mental, or other listing." (R. 16).  As such, Plaintiff "d[id]

not have an impairment or combination of impairments that meets or medically equals

one of the listed impairments." *Id*.

The relevant listing of impairments in this case includes 20 C.F.R. Pt. 404, Subt.

P, Appendix 1, § 1.02 (major dysfunction of a joint(s) due to any cause) ("§ 1.02"), and

20 C.F.R. Pt. 404, Subt. P, Appendix 1, § 12.04 (affective disorders) ("§ 12.04").[15]

### 1. Major Dysfunction of a Joint

Relevant to the instant case, disability under § 1.02 (major dysfunction of a

joint(s) due to any cause), here, Plaintiff's left and right knees, is characterized by

> [1] gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous
> ankylosis, instability) and [2] chronic joint pain and stiffness with signs of
> limitation of motion or other abnormal motion of the affected joint(s), and [3]
> findings on appropriate medically acceptable imaging of joint space narrowing,
> bony destruction, or ankylosis of the affected joint(s) With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 1.02.

Contrary to the ALJ's finding that "the diagnostic evidence . . . references only

mild to moderate degrees of bilateral knee arthritis," substantial evidence in the record

supports Plaintiff's knee impairment was characterized by gross anatomical deformity

---

[15]  Section 5.05 (chronic liver disease) would apply to Plaintiff's liver disease (Hepatitis C), but Plaintiff does not argue that Plaintiff is impaired by Plaintiff's Hepatitis C, and nothing in the record establishes it is relevant. As such, the court does not consider whether Plaintiff is disabled based on chronic liver disease.

(e.g., subluxation, contracture, bony or fibrous ankylosis, instability) . . . and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), thus meeting the first criteria of §1.02.

Specifically, an X-ray of Plaintiff's right knee on September 5, 2006, showed

complete disruption of the anterior cruciate ligament consistent with a tear . . . a bucket handle type tear . . . involving the lateral miniscus . . . edema . . . into the proximal portion of the central tibia, as well as along the remnants of the physis. An area consistent with a nondisplaced fracture below the level of the medial tibial spine . . . patellofemerol articulation demonstrates significant degenerative changes involving primarily the lateral compartment of the knee . . . changes present indicative of degenerative changes involving the medial aspects of the medial compartment of the knee.

(R. 186)(underlining added).

On September 20, 2006, Plaintiff visited Erie County Medical Center after tripping at work, where an X-ray of Plaintiff's right knee showed "large joint effusion which would be concerning for internal derangement . . . [and] advanced osteoarthritic changes." (R. 216-18)(underlining added). An MRI of Plaintiff's left knee on May 10, 2007, showed the possibility of a disrupted fibular collateral ligament, significant degenerative changes within the lateral and medial menisci, changes consistent with a high grade sprain/significant partial tear involving the anterior cruciate ligament, degenerative changes in the distal femur and proximal tibia, and identified joint effusion (R. 280), thus establishing Plaintiff's knee impairment was characterized by instability and gross anatomical deformity as required under § 1.02.

Second, substantial evidence in the record supports Plaintiff's right knee impairment resulted in chronic joint pain and stiffness with signs of limitation of motion as required under § 1.02. In particular, on January 26, 2006, Dr. Florio applied a knee

immobilizer and prescribed a cane to assist Plaintiff with stability and walking. (R. 195). On September 20, 2006, Plaintiff sought treatment for knee pain from Kenmore Mercy Hospital (R. 212), and was prescribed Lortab at the E.C.M.C. emergency room to help alleviate his knee pain on October 23, 2006. (R. 218). On February 6, 2007, Plaintiff was referred to Dr. Gustilo for psychiatric evaluation, where Plaintiff was diagnosed with major depression, single episode, moderate dysthmic disorder, polysubstance abuse in remission, personality disorder not otherwise specified with antisocial features, severe osteoarthritis with recurrent knee swelling and chronic pain, and severe health problems that interfere with Plaintiff's ability to work. (R. 431). On May 24, 2007, Plaintiff sought treatment from V.A. Hospital to help alleviate his knee pain (R. 321), and Plaintiff testified he had to be carried out of work twice for knee pain and associated swelling. (R. 29). Notably, none of Plaintiff's physician's refused to prescribe pain medication to alleviate Plaintiff's knee pain, even with the knowledge Plaintiff suffered from drug addiction and was enrolled in drug treatment therapy. (R. 197, 218, 225, 266).

The ALJ's categorical rejection of Plaintiff's claims of pain relating to Plaintiff's right knee impairment on the basis that Plaintiff's criminal bank robbery conviction rendered Plaintiff without any credibility (R. 15), was error. In particular, although the ALJ may consider Plaintiff's history of bank robbery and substance abuse in determining Plaintiff's credibility, *Williams v. Commissioner of Social Security*, 423 F. Supp. 2d 77, 84 (W.D.N.Y. 2006)(ALJ properly considered Plaintiff's criminal history and other factors in assessing Plaintiff's credibility), the ALJ is required to consider additional factors necessary to a proper credibility assessment, but in this case failed to consider additional factors necessary to a proper credibility assessment.

24

A claimant's credibility determination must include the entire case record, objective medical evidence, the individual's own statements about symptoms, statements provided by treating or examining physicians or psychologists, and other persons about the symptoms and how they affect the claimant, and any other relevant evidence in the case record. *See* Social Security Ruling ("SSR")  96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996); *Aragon-Lemus v. Barnhart*, 280 F. Supp. 2d 62, 70 (W.D.N.Y. 2003)(credibility assessment must be supported by substantial evidence). Relevant evidence includes, but is not limited to, an evaluation of medical signs and laboratory findings, diagnosis, prognosis and other medical findings by treating or examining physicians and other medical sources, treatment and response, prior work record and efforts to work, daily activities, and other information about the individual's symptoms and how the symptoms affect the individual's ability to work. SSR 96-7p at *1. Here, the ALJ's determination Plaintiff lacked credibility solely because of his past criminal record does not consider the required factors under SSR 96-7p, including Plaintiff's work history and VESID training. *Tarsia v. Astrue*, 2011 WL1313699, at *2 (2d Cir. Apr. 7, 2011)(a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability, citing *Rivera v. Schweiker,* 717 F.2d 719, 725 (2d Cir. 1983)); *Hall v. Astrue*, 677 F.Supp.2d 617, 632 (W.D.N.Y. 2009)(ALJ's omission of claimant's medication history and several medical conclusions that supported Plaintiff's credibility raised doubt whether entire record was considered).

The ALJ's rejection of the opinions of Plaintiff's treating physicians regarding the severity of Plaintiff's knee impairment is also without support of substantial evidence, as none of Plaintiff's treating physicians ever questioned the presence of Plaintiff's pain.

*Carlisle v. Barnhart*, 392 F.Supp. 2d 1287, 1294 (N.D. Ala. 2003)(ALJ's rejection of Plaintiff's treating physician opinions improper where record supports treating physicians never questioned the presence of Plaintiff's pain). Thus, substantial evidence in the record establishes Plaintiff's knee impairment was characterized by chronic joint pain and stiffness as required under § 1.02.

Third, consistent with the criteria of "findings on appropriate medically acceptable imaging of joint space narrowing," § 1.02, V.A. Hospital medical records establish Plaintiff's knee impairment resulted in joint space narrowing. In particular, Dr. Florio examined Plaintiff on January 26, 2006, diagnosed Plaintiff with bleeding into the joint space of the right knee, and opined Plaintiff's January 26, 2006 X-ray showed "narrowing within all three knee compartments." (R. 187)(underlining added). An X-ray of Plaintiff's right knee on September 5, 2006, showed "significant joint effusion . . . [and] loss of joint space" (R. 186)(underlining added), thus supporting Plaintiff's knee impairment resulted in loss of joint space and resulting narrowing as required under § 1.02.

Moreover, the ALJ's failure to adequately address the opinions of Plaintiff's treating physicians, supporting Plaintiff's pain allegations, violates the treating physician rule. The treating physician's rule requires the ALJ grant a treating physician opinion "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). In particular, the Act provides

> [g]enerally, we give more weight to opinions from your
> treating sources, since these sources are likely to be the
> medical professionals most able to provide a detailed,

> longitudinal picture of your medical impairment(s) and may
> bring a unique perspective to the medical evidence that
> cannot be obtained from the objective medical findings alone
> or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations. If we find
> that a treating source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-supported by
> medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other substantial
> evidence in your case record, we will give it controlling
> weight.

20 C.F.R. § 404.1527(d)(2); *Clark v. Commissioner of Soc. Sec.*, 114 F.3d 115, 118 (2d Cir. 1998).

Applicable regulations define "treating source" as a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] ... with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §404.1502. In the instant case, Plaintiff, a veteran, consistently sought and received treatment from physicians at the V.A. Hospital. Notwithstanding the numerous medical opinions that Plaintiff suffered a severe knee impairment by Plaintiff's treating physicians at V.A. Hospital, the ALJ relied instead on the medical findings of an internal medical examination by Dr. Kelley during a single examination conducted on February 27, 2007. (R. 18). The ALJ chose to grant no weight to the opinions of Plaintiff's treating physicians at the V.A. Hospital, Facts, *supra*, at 23,  including Drs. Florio, Delbalso, Fuchs, Pizzella, and Sanghvi, reasoning that those opinions lacked credibility because the opinions relied on statements made by the Plaintiff who otherwise lacked credibility ("[Plaintiff] lacks credibility and little weight is given to his statements, as well as statements of any professional based subjectively thereon."). (R. 17).

27

The Act requires ALJ's assign controlling weight to treating physician opinions supported by relevant evidence. 20 C.F.R. § 404.1527(d)(3). *Myers v. Astrue*, 681 F. Supp.2d 388, 404 (W.D.N.Y. 2010) (treating physician's rule requires ALJ's assign controlling weight to treating physician opinions supported by medically acceptable clinical and laboratory techniques). Contrary to the ALJ's determination Plaintiff's treating physician's lacked credibility, substantial evidence in the record supports Plaintiff's treating physician's opinions relied on medically acceptable clinical and laboratory findings including numerous X-rays and MRI images. In particular, the opinion of Dr. Florio (January 26, 2006 X-ray showed "narrowing in all three compartments" (R. 187)), Dr. Delbalso (February 22, 2006 MRI showed "bucket handle type tear in lateral meniscus . . . complete disruption of the anterior cruciate ligament . . . significant joint effusion" (R. 186)), Dr. Fuchs (September 5, 2006 X-ray showed "tricompartment degenerative changes of both knees . . . [with] Pellegrini-Strieda disease" (R. 182)), Dr. Pizzella (September 20, 2006 X-ray showed "large joint effusion . . . [a]dvanced osteoarthritic changes . . . evidence of joint space loss" (R. 216)), Dr. Paul (October 23, 2006 X-ray showed "prominent effusion . . . loss of retropellar space" (R. 221)), Dr. Sanghvi (March 5, 2007 X-ray showed "large osteophyte projecting from the medical condyle" (R. 228)), Radiologist Delbalso (May 10, 2007 MRI showed "significant degenerative changes . . . consistent with high grade sprain/significant partial tear involving anterior cruciate ligament . . . joint effusion identified" (R. 280)), and thus require controlling weight. 20 C.F.R. § 404.1527(d)(2). Significantly, the ALJ points to no medical evidence in the record, including from Dr. Kelley, that indicates these repeated objective findings are inconsistent with Plaintiff's statements describing

28

his experiencing severe knee pain. (R. 29, 35, 195, 212, 217, 218, 307, 321, 354, 321).

Nevertheless, the ALJ violated the treating physician rule by refusing to grant Plaintiff's

treating physician opinions controlling weight (even where the treating physician

opinions relied on relevant medical evidence.).

Additionally, the Act requires the ALJ apply certain factors in determining the

weight granted treating physician opinions including 1) length of the treatment

relationship and frequency of examination; 2) nature and extent of treatment

relationship; 3) supportability; 4) consistency, and 5) specialization. 20. C.F.R. §

404.1527(d)(2). The Act requires the ALJ provide "good reasons" in the notice of

determination for the weight assigned to a claimant's treating source's opinions to

provide claimant's with an understanding of the disposition of their case. 20 C.F.R. §

404.1527(d)(2); *Snell v. Apfel*, 127 F.3d 128, 134 (2d Cir. 1999)(reason giving exists in

part to let claimant's understand the disposition of their case). Here, the ALJ's failure to

discuss the reasons for the weight granted the opinions of Plaintiff's treating sources,

including the opinions of Dr. Florio (right knee narrowing in three compartments)(R.

187), Dr. Delbalso (significant joint effusion identified) (R. 186), Dr. Pizzella (large joint

effusion)(R. 216), Dr. Paul (prominent effusion and loss of retropellar space)(R. 221),

Dr. Gustilo (recurrent knee swelling and chronic pain)(R. 432) and Dr. Mirza (complete

disruption of the posterior horn of the lateral meniscus and joint effusion)(R. 279)

requires remand for further development of the record.

The ALJ's finding "no treating or examining source has observed significant knee

swelling" (R. 19), is also without support of substantial evidence of the record. In

particular, on January 26, 2006, Plaintiff's right knee was so swollen and painful, Dr.

Florio was required to surgically aspirate the fluid from Plaintiff's knee. (R. 195). Plaintiff

testified he stopped working because his knees "swelled up to where [he] couldn't stand

the pain in the end," and that he had to be carried out of work on two separate

occasions because his knees "gave out." (R. 29).   An MRI test of Plaintiff's right knee

on February 22, 2006, showed "swelling caused by joint fluid" and identified a

"significant joint effusion." (R. 186). An X-ray of Plaintiff's right knee on September 20,

2006, showed a "large joint effusion" (R. 216), and possible suprapatellar joint effusion

(joint fluid characterized by swelling). *Id*. On February 22, 2006, Dr. Delbalso evaluated

an MRI of Plaintiff's right knee that showed edema (swelling caused by excess fluid) of

the right knee (R. 186), thus rendering the ALJ's finding "no treating or examining

source has observed significant knee swelling" (R. 19), contrary to substantial evidence

in the record.

The ALJ's determination that "no treating or examining source . . . g[ave] the

[Plaintiff] orders to elevate his leg(s)" (R. 19), is also contrary to instructions Plaintiff

received  from E.C.M.C.'s emergency department on October 23, 2006, to elevate his

legs in order to alleviate his knee pain. (R. 218). The ALJ's further finding Plaintiff was

not disabled because "no surgery has been recommended" (R. 19), is also erroneous

given that on February 27, 2007, Dr. Kelley (whose opinion the ALJ relied upon for

Plaintiff's residual functional capacity assessment) opined Plaintiff's arthritis "needs

intervention." (R. 227), indicating surgery or an alterative treatment method was

necessary.

The Act requires a determination whether an individual can ambulate effectively

on the medical and other evidence in the case record, generally without developing

30

additional evidence about the individual's ability to perform the specific activities listed

as examples in § 1.00B2b(2)(effective ambulation). To ambulate effectively, individuals

must be capable of sustaining a reasonable walking pace over a sufficient distance to

be able to carry out the activities of daily living. *Id*.

Here, evidence in the record indicates Plaintiff's knee pain adversely affected

Plaintiff's ability to ambulate. 20 C.F.R. § 1.00B2b. In particular, a Work Status Report

on September 22, 2006 showed Plaintiff limited to standing and walking only twenty-five

percent of each work shift, and restricted to crutches (R. 217), Dr. Florio prescribed a

knee immobilizer and cane for Plaintiff (R. 195), and Plaintiff reports he spends most

days at home reading, goes outside "when [he] ha[s] a ride," and does not go anywhere

on a regular basis because he cannot stand for too long. (R. 122-24). Because the

medical evidence establishes Plaintiff's knee impairment meets the initial criteria set

forth under § 1.02, the ALJ was required to determine whether Plaintiff's knee

impairment rendered Plaintiff unable to effectively ambulate, as required under  §

1.02B2b, and the matter should also be remanded for this determination.

Although, in general, disability determination evidence includes findings of

symptoms and statements, medical and laboratory findings, treating or nontreating

source opinions about medical history, diagnosis, prescribed treatment, daily activities,

efforts to work and other evidence, 20 C.F.R. § 404. 1528(a), and requires disability

claimants to follow certain prescribed treatments, 20 C.F.R. § 404.1530 *et seq.*, the Act

does not otherwise direct a finding of not disabled where a particular course of

treatment (surgery) has not been recommended by a claimant's physicians. Thus, the

ALJ's finding Plaintiff is not disabled because no surgery has been recommended to

resolve Plaintiff's knee impairment constitutes substantial error and requires remand.

### 2. **Affective Disorders**

Disability under § 12.04 (affective disorders), is characterized by "a disturbance

of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R.

Pt. 404, Subpt. P, Appendix 1, § 12.04A1 requires medically documented persistence,

either continuous or intermittent, of four of the following:

    (a)    Anhedonia or pervasive loss of interest in almost all activities; or
    (b)    Appetite disturbance with change in weight; or
    (c)    Sleep disturbance; or
    (d)    Psychomotor agitation or retardation; or
    (e)    Decreased energy; or
    (f)    Feelings of guilt or worthlessness; or
    (g)    Difficulty concentrating or thinking; or
    (h)    Thoughts of suicide; or
    (i)    Hallucinations, delusions or paranoid thinking; . . .
           AND
    B.     Resulting in at least two of the following:
    1.     Marked restriction of activities of daily living; or
    2.     Marked difficulties in maintaining social functioning; or
    3.     Marked difficulties in maintaining concentration, persistence, or pace; or
    4.     Repeated episodes of decompensation, each of extended duration. OR
    C.     Medically documented history of a chronic affective disorder of at least
           2 years' duration that has caused more than a minimal limitation of
           ability to do basic work activities, with symptoms or signs currently
           attenuated by medication or psychosocial support, and one of the
           following:
    1.     Repeated episodes of decompensation, each of extended duration; or
    2.     A residual disease process that has resulted in such marginal adjustment
           that even a minimal increase in mental demands or change in the
           environment would be predicted to cause the individual to decompensate;
           or
    3.     Current history of 1 or more years' inability to function outside of a
           highly supportive living arrangement, with an indication of continued need
           for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

To establish disability under § 12.04, a claimant must meet the criteria either for both §

12.04A and § 12.04B, or § 12.04C. 20 C.F.R. § 404.1520(a) outlines the steps required to properly evaluate mental impairments, and requires ALJ's rate four broad functional areas when assessing functional limitations related to mental impairments. 20 C.F.R. § 404.1520(c)(3). The degree of limitation in the first three areas (activities of daily living, social functioning, and concentration, persistence, or pace) use a five-point scale: none, mild, moderate, marked, and extreme.

In the instant case, the ALJ correctly found Plaintiff's mental limitations "did not cause more than minimal limitation in [Plaintiff's] ability to perform his basic mental work activities." (R. 14).

In particular, on April 9, 2007, Psychologist Totin evaluated Plaintiff with no restriction of activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. (R. 245). Inasmuch as Plaintiff's GAF scores reveal periods of psychiatric exacerbation (GAF score of 45 on January 19, 2007 (R. 434); 48 on April 26, 2007 (R. 420); 30 on April 30, 2007 (R. 283); and 30 on May 1, 2007 (R. 380)), such limited periods of psychiatric decline do not rise to the level of criteria required under § 404.1520(c)(3), and thus Plaintiff is not disabled under § 12.04.

If, upon remand, the ALJ determines Plaintiff's knee disorder renders Plaintiff unable, to effectively ambulate under the criteria of § 1.00B2b, the ALJ must then grant Plaintiff benefits and further consideration of the matter should cease. Alternatively, upon remand, should the ALJ determine Plaintiff's ambulation limitation does not meet the criteria under § 1.00B2b, the ALJ must nevertheless consider whether Plaintiff is, as claimed, unable to stand or walk for a total of six hours in an eight-hour workday.

However, because the decision is before this court for a report and recommendation, the court proceeds to the next step of the inquiry.

**E.     "Residual Functional Capacity" to Perform Past Work**

The fourth inquiry in the five-step analysis is whether the applicant has the "residual functional capacity" to perform past relevant work. "Residual functional capacity" is defined as the most work a claimant can still do despite limitations from an impairment and/or its related symptoms. 20 C.F.R. § 416.945(a). If a claimant's residual functional capacity is insufficient to allow the performance of past relevant work, the ALJ must assess the claimant's ability to adjust to any other work. 20 C.F.R. § 416.960(c).

In the instant case, the ALJ determined Plaintiff retained residual functional capacity to perform past relevant work as an "assembler/press helper," and electronics assembler as generally performed. (R. 19). The court notes although the ALJ's decision asserts that Plaintiff was capable of performing "press helper" (semi-skilled, heavy) work, *id.,* the ALJ also found, inconsistent with this assertion, that Plaintiff retained the residual functional capability to perform past relevant work as an electronics helper (semi-skilled, light work). *Id*. The ALJ further found Plaintiff capable of performing light work with the additional limitations of occasional crawling, climbing, and squatting, without limitations to standing or walking within an 8-hour workday. (R. 18). Plaintiff contests this finding contending Plaintiff is unable to stand or walk for a total of six hours in an eight-hour workday, Plaintiff's Memorandum at 5, a conclusion Plaintiff maintains would limit Plaintiff to sedentary work, and thus, based on Plaintiff's age, disabled provided Plaintiff's semiskilled skills are not transferable. 20 C.F.R. Pt. 404,

34

Subpt. P, App. 2 Rule 201.1.

The court's review of the administrative record establishes the ALJ failed to consider Plaintiff's ability to walk or stand, rendering the ALJ's determination that Plaintiff is capable of performing his past relevant work, categorized as semi-skilled, light work, erroneous as a matter of law. This error requires remand to determine whether Plaintiff retains the requisite ability to stand or walk for light work or, alternatively, is able to operate arm or leg pedals. If Plaintiff cannot perform light work, then Plaintiff is limited to sedentary work, which requires a determination as to whether Plaintiff's semi-skilled skills are transferable because, given Plaintiff's age, 51 as of the date of the administrative hearing, whether such skills are transferable would be determinative as to whether Plaintiff is disabled.[16] 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.10.

An individual's exertional capability refers to the performance of "sedentary," "light," "medium," "heavy," and "very heavy" work. *Decker v. Harris*, 647 F.2d 291, 294 (2d Cir. 1981). In the instant case, only the categories of light and sedentary work are relevant. "Sedentary work" is defined as "lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . [j]obs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a) ("§ 404.1567(a)"). In contrast, "light work" involves lifting no more than 20 pounds at a time with frequent lifting or

---

[16] A finding by the ALJ on remand that Plaintiff's bilateral knee disorder has not rendered Plaintiff unable to effectively ambulate under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b, as discussed in connection with the Listing of Impairments relevant to Plaintiff's knee impairment, Discussion, *supra*, at 25, does not preclude the ALJ's reconsideration of whether Plaintiff is unable to stand or walk for six hours in an eight-hour workday.

carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b) ("§

404.1567(b)"). Even though the job's weight lifting requirement may be minimal, a job is

in this category when the job requires a good deal of walking or standing, or when it

involves sitting most of the time with some pushing and pulling of arm or leg controls.

*Id*.

In this case, the ALJ determined Plaintiff was capable of performing "light work"

without consideration of the criteria for light work as defined under § 404.1567(b),

specifically, "a good deal of walking or standing," or otherwise sitting most of the time

with some pushing and pulling or arm or leg controls. Remand is thus required for such

further development of the record and a determination by the ALJ. Further, in

determining whether Plaintiff could perform his past relevant work and, thus, light work,

the ALJ incorrectly disregarded the opinion of Plaintiff's numerous treating sources,

including P.T. DiRienzo and P.A. Barber, in violation of the treating physician rule,

Discussion, *supra,* at 25, and made an improper credibility determination, Discussion,

*supra*, at 24, instead relying exclusively on the February 27, 2007 opinion of

consultative examiner Dr. Kathleen Kelley. The ALJ was not free to completely

disregard the opinions of Plaintiff's treating medical sources, however, in favor of a

single opinion from a non-treating source.

Inasmuch as the Act affords the ALJ discretion to assess a claimant's residual

functional capacity, the evidence, in addition to evidence from acceptable medical

sources listed in 20 C.F.R. § 404.1315(a) ("§ 404.1315(a)"), may also include

consultative medical examinations, statements provided by medical sources (whether

or not they are based on formal medical examinations), and descriptions and

observations of the claimant by the claimant, the claimant's family, neighbors, friends, or other persons. 20 C.F.R. § 404.1545(a)(3). In addition to the medical sources listed in  § 404.1545(a), acceptable medical sources used to determine a claimant's ability to work include nurse-practitioners, physician's assistants, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R. § 404.1513(d)(1).

Upon remand, a finding by the ALJ that Plaintiff is incapable of performing any past relevant work, would necessarily be based on a finding that Plaintiff could not perform light work. In such case, the ALJ would then be required to determine whether Plaintiff could perform sedentary work, and whether Plaintiff's semi-skilled skills are transferrable to a sedentary job, existing in significant numbers in the national economy. If the ALJ determines Plaintiff's semi-skilled skills are not transferrable, and given Plaintiff's age, a finding that Plaintiff is disabled is required. 20 C.F.R. Pt. 404, Subpt. P, App. 2 Rule 201.1.

### F.    Suitable Alternative Employment in the National Economy

Should the ALJ determine Plaintiff is capable of either light work or only sedentary work, and that Plaintiff's semi-skilled skills are transferrable, the ALJ must determine whether other jobs exist in significant numbers in the national economy which Plaintiff can perform. It is improper to determine a claimant's residual work capacity based solely upon an evaluation of the severity of the claimant's individual complaints. *DeLeon v. Secretary of Health and Human Services,* 734 F.2d 930, 937 (2d Cir. 1984). Rather, the Second Circuit requires that "all complaints . . . must be considered together in determining . . . work capacity." *Id.* at 937.To make such a determination, the Commissioner must first show that the applicant's impairment or

37

impairments are such that they nevertheless permit certain basic work activities essential for other employment opportunities. *Decker*, 647 F.2d at 294. Specifically, the Commissioner must demonstrate by substantial evidence the applicant's "residual functional capacity" with regard to the applicant's strength and "exertional capabilities." *Id*. at 294. Further, here, it is undisputed the Plaintiff's previous employment was in a semi-skilled job. As such, if the ALJ, on remand, finds Plaintiff's residual functional capacity is sedentary, the ALJ must determine whether Plaintiff's semi-skilled skills are transferrable to the new employment. *Id*. at 294.

Moreover, where, as in the instant case, nonexertional limitations diminish a claimant's ability to perform the full range of "light" work, the ALJ should not rely on the Act's medical-vocational guidelines to meet the burden of proof concerning the availability of alternative employment. Rather, the ALJ is required to solicit testimony from a vocational expert regarding the availability of jobs in the national and regional economies suitable for employment of an individual with exertional and nonexertional limitations similar in nature to the claimant's. *Bapp*, 802 F.2d at 606. Following a vocational expert's testimony, a plaintiff must be afforded an opportunity to rebut the expert's evidence. *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989).

In the instant case, the ALJ posed hypothetical exertional and nonexertional limitations to the VE related to Plaintiff's limitations (R. 38), the VE reviewed Plaintiff's credentials and limitations and concluded that substantial gainful employment opportunities exist for an individual of the same age and education as Plaintiff, who was at most, capable of light work. *Id*. The Act, however, requires the ALJ use the same residual functional capacity assessment used to determine if a claimant can perform

past relevant work when assessing a claimant's ability to perform other work. 20 C.F.R.

§ 404.1550(c)(2). "An ALJ may rely on a vocational expert's testimony regarding a

hypothetical as long as the facts of the hypothetical are based on substantial evidence.

. . and <u>accurately</u> <u>reflect</u> <u>the</u> <u>limitations</u> <u>and</u> <u>capabilities</u> <u>of</u> <u>the</u> <u>claimant</u>." *Calabrese v.*

*Astrue*, 2009 WL 5031356, at *2 (2d Cir. Dec. 23, 2009) (citing *Dumas*, 712 F.2d at

1553-54; *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981))(underlining added).

Further, ALJ's are required to provide, at a minimum, the reasons for their decisions,

*Connor*, 900 F. Supp. 994, 1003 (N.D.Ill. 1995) (citing *Diaz v. Chater*, 55 F. 3d 300, 307

(7th Cir. 1995)), and remand is proper for consideration of additional evidence not

previously addressed. 42 U.S.C. § 405(g); *Connor*, 900 F.2d at 1004 (remand where

ALJ failed to consider entirety of VE's testimony).

In particular, the ALJ posed a hypothetical situation to the VE that included light

exertion, occasionally squatting, kneeling, crawling, climbing, and stooping (R. 38),

upon which the VE determined, that Plaintiff would be capable of performing the

positions of small products assembly (unskilled, light) with 31,312 positions in the

national economy, and 749 jobs in the Western New York region. (R. 37). As

discussed, Discussion, *supra*, at 36, however, this determination failed to consider

whether Plaintiff could, in fact, perform all the requirements for light work.[17] Nor did the

ALJ pose any hypothetical encompassing all of Plaintiff's exertional limitations such as

walking and standing, and non-exertional limitations such as pain. (R. 38). *See*

*Melendez v. Astrue*, 630 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) (citing *Dumas*, 712 F.2d

---

[17]If Plaintiff's RFC were limited to "sedentary" exertion, Plaintiff would, based on his age (51) and prior work history be disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1.

at 1554 (there must be substantial record evidence to support the assumption upon which the vocational expert bases his opinion)). Significantly, Dr. Baskin's psychiatric evaluation performed on behalf of the Social Security Administration on February 27, 2007, showed Plaintiff's "medical [and] physical problems may interfere with [Plaintiff's] ability to maintain a regular schedule" and that Plaintiff "may have some difficulty dealing with stress." (R. 233).

Upon remand, the ALJ should pose a hypothetical question to the VE that encompasses all of Plaintiff's exertional and non-exertional limitations, including Plaintiff's limited ability to walk, stand, and maintain a regular schedule, and a determination of whether, based on the findings of the VE, Plaintiff is capable of performing light work as defined under 20 C.F.R. § 404.1567(a), or sedentary work as defined under 20 C.F.R. § 404.1567(b). Additionally, because Plaintiff, 51 years of age at the hearing on February 9, 2009, is "approaching advanced age," 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table 1, the ALJ must also determine whether any of Plaintiff's skills from Plaintiff's past relevant work are transferable to a new work setting or whether Plaintiff is disabled. *Id*.


## CONCLUSION

Based on the foregoing, Defendant's motion (Doc. No. 7) should be DENIED; Plaintiff's motion seeking judgment on the pleadings should be DENIED (Doc. No. 9); Plaintiff's motion alternatively seeking remand for further consideration should be GRANTED; and the matter REMANDED for further development of the record and reconsideration of Plaintiff's claim in accordance with this Report and

Recommendation.

Respectfully submitted,

/s/ *Leslie G. Foschio*

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      August 8, 2011
               Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that the Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to the Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of the Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        August 8, 2011
                    Buffalo, New York